IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

_____

SONYA STRAWN,                        )
                                     )
    Plaintiff,                       )
                                     )
v.                                   )        No. 20-cv-1065-TMP
                                     )
COMMISSIONER OF SOCIAL               )
SECURITY,                            )
                                     )
    Defendant.                       )
                                     )

_____

## ORDER AFFIRMING THE COMMISSIONER'S DECISION
_____

On March 23, 2020, Sonya Strawn filed a Complaint seeking judicial review of a social security decision.[1] (ECF No. 1.) Strawn seeks to appeal from a final decision of the Commissioner of Social Security ("Commissioner") denying her disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-34. For the reasons below, the decision of the Commissioner is AFFIRMED.

## I.   BACKGROUND

On May 14, 2017, Strawn submitted an application for Social Security Disability Insurance ("SSDI") benefits under Title II of

_____

[1]After the parties consented to the jurisdiction of a United States magistrate judge on August 28, 2020, this case was referred to the undersigned to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 10.)

the Act. (R. 99, 259-60.) The application, which alleged an onset date of February 5, 2017, was denied initially and on reconsideration. (R. 99, 158, 180.) Strawn then requested a hearing, which was held before an Administrative Law Judge ("ALJ") on February 1, 2019. (R. 99, 116-43.)

After considering the record and the testimony given at the hearing, the ALJ used the five-step analysis to conclude that Strawn was not disabled from February 5, 2017, through the date of the ALJ's decision. (R. 99-109.) At the first step, the ALJ found that "[Strawn] has not engaged in substantial gainful activity since February 5, 2017, the alleged onset date." (R. 101.) At the second step, the ALJ concluded that Strawn suffers from the following severe impairments: cervical degenerative disc disease, lumbar degenerative disc disease, status-post laminectomy and fusion, and chronic obstructive pulmonary disease ("COPD"). (R. 101.) The ALJ determined that Strawn's gastrointestinal disorder was non-severe because "the record does not indicate this is associated with more than minimal work-related functional limitations." (R. 101.) The ALJ similarly found that "[Strawn's] medically determinable mental impairments of depression and anxiety, considered singly and in combination, do not cause more than minimal limitation in [Strawn's] ability to perform basic

mental work activities and are therefore non-severe." (R. 102.)

At the third step, the ALJ concluded that Strawn's impairments do not meet or medically equal, either alone or in the aggregate, the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 103.) Accordingly, the ALJ had to then determine whether Strawn retained the residual functional capacity ("RFC") to perform past relevant work or could adjust to other work. The ALJ found that:

> [Strawn] has the residual functional capacity to perform
> light work as defined in 20 CFR 404.1567(b) except she
> can perform postural activities on an occasional basis
> and perform occasional overhead reaching.

(R. 103.) Pursuant to 20 C.F.R. §404.1567(b), light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." Additionally, the light work category includes jobs "requir[ing] a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

In reaching this RFC determination, the ALJ discussed Strawn's testimony and the medical evidence in the record. (R. 104-07.) The ALJ summarized Strawn's account of her symptoms and condition as follows:

> [Strawn] reported constant back pain as well as muscle

-3-

> weakness in her legs, arms, and back. She reported she
> was unable to lift more than 20 pounds. She reported
> that she is unable to squat, bend, and twist and has
> pain with climbing stairs and kneeling. She alleged she
> is able to walk approximately 500 feet before needing to
> stop and rest due to shortness of breath and back pain.
> She also reported pain in her arms and neck when she
> reaches up and down. The claimant testified that she has
> neuropathy that goes down her legs to her feet and muscle
> cramps that last 20 minutes to an hour at a time on an
> average of four times per week. She also has reported
> side effects of medication including loss of appetite,
> drowsiness, constipation, mood change, slurred speech,
> and loss of concentration and memory.

(R. 104 (internal citations omitted).) Upon review of the evidence,
the ALJ found that "[Strawn's] medically determinable impairments
could reasonably be expected to cause the alleged symptoms," but
determined that "[Strawn's] statements concerning the intensity,
persistence and limiting effects of these symptoms are not entirely
consistent with the medical evidence and other evidence in the
record." (R. 104.)

The ALJ then discussed Strawn's treatment history,
summarizing as follows:

> Strawn has a history of back pain dating back to a 2014
> injury at work (Ex. 5F). [Strawn] reported she was doing
> relatively well until she experienced an exacerbation in
> her back pain at work when attempting to climb a stair
> in February 2017 (Ex. 3F at 8). She was treated with a
> steroid injection and a week of physical therapy (Ex. 3F
> at 8). On examination in February 2017, [Strawn] had an
> antalgic gait on the left, though she was able to heel
> and toe walk normally (Ex. 2F at 23). There was no spasm,
> and motion was without pain, crepitus, or evident
> instability (Ex. 2F at 23). Straight leg raise on the

right produced no back or leg pain (Ex. 2F at 23). Seated
straight leg raise on the left produced leg pain below
the knee (Ex. 2F at 23). A March 2017 MRI of the lumbar
spine showed disc herniation at L4-5 which resulted in
bilateral lateral recess stenosis and in moderate to
severe central canal stenosis (Ex. 2F at 9; 7F at 20).
A May 2017 MRI of the cervical spine showed severe
foraminal stenosis at C4-5, a mild disc bulge and
moderate to severe left neural foraminal stenosis and
mild to moderate central canal stenosis at CS-6,
moderate to severe right neural foraminal stenosis at
C3-4, and severe left neural foraminal stenosis at C2-3
(Ex. 7F at 13). In May 2017, [Strawn] underwent an L4-5
laminectomy (Ex. 6F).

Post-surgery, she exhibited improvement on examination.
For example, on examination of her lumbar spine in July
2017, musculature was non-tender to palpation, range of
motion was normal strength was normal, there was no
muscle atrophy, and straight leg raise was negative
bilaterally (Ex. 14F at 27). Her gait and station was
normal as well (Ex. 14F at 28). Radiology results of her
cervical and lumbar spine showed no significant
abnormalities (Ex. 14F at 28).

(R. 104.) The ALJ additionally commented that in August 2017,
"[Strawn] reported that her back was 'somewhat better' with 'not
as much pain,' but that occasionally slight movement will cause
here to have problems for two to three days." (R. 104, 674.)

The ALJ acknowledged Strawn's complaints of pain, burning
paresthesias, and weakness in the upper and lower limbs. (R. 105,
680.) In October 2017, an EMG/NCS study of both upper limbs was
normal and demonstrated no median or ulnar neuropathy and no
peripheral nerve explanation for Strawn's symptoms. (R. 105, 680.)
An MRI of the lumbar spine, dated October 12, 2017, showed "L4-5

-5-

postoperative changes" of "small synovial cysts" medial to the left facet joint. (R. 105, 799.) The MRI also demonstrated contact on the L5 nerve roots without compression and evidence of granulation tissue in the ventral epidural space. (R. 105, 799.) The ALJ noted, however, that despite ongoing complaints following surgery in December 2017, "[Strawn's] lumbar spine examination was within normal limits, including negative straight leg raise, her gait was normal, and she [had] full strength and intact sensation to light touch." (R. 105, 811-14.)

The ALJ acknowledged that Strawn's treatment history also included injections and physical therapy. (R. 105, 727, 806.) The ALJ then discussed records from Strawn's treatment with Dr. David McCord:

> [Strawn] showed abnormalities on examination with David McCord, M.D. in December 2017, with increased back pain with straight leg raises on the right elevated to 40 degrees and on the left elevated to 25 degrees, as well as antalgic gait (Ex. 17F at 9). In March 2018, she underwent an L3-S1 fusion (Ex. 21F). At her first follow-up visit, she was "overall doing well" and was "staying active and walking two miles a day" (Ex. 22F at 4). On range of motion testing, she was able to twist to 30 degrees and reach fingertips to her knees (Ex. 22F at 4). She was able to hop without overt problems (Ex. 22F at 4). She had no motor weakness or sensory loss (Ex. 22F at 4). Her x-rays "looked good" (Ex. 22F at 4). Dr. McCord concluded that since she was doing well, he would follow her on a "conservative basis" (Ex. 22F at 4).

(R. 105.) An MRI of the lumbar spine in November 2018 showed

-6-

"moderate disc space narrowing and disc desiccation at L1-2," "mild-to-moderate disc space narrowing and disc desiccation at L2-3" and "straightening of the lumbar lordosis" likely related to multilevel fusion. (R. 105, 1071.) No stenosis was shown. (R. 105, 1069.)

The ALJ emphasized that Dr. McCord stated in a treatment record dated November 1, 2018, it was "not obvious at all what is bothering her," as her complaints "in part do not seem perfectly anatomic." (R. 105, 1069.) The ALJ also noted that when Strawn presented for treatment at a pain clinic in December 2018, she was "ambulating normally" but "exhibited decreased sensation on the left lower extremity" and "was tender along the midline and bilateral spinous processes of the lumbar spine." (R. 105, 1180-81.) The ALJ additionally stated as follows:

> The record consistently shows normal gait on examinations following her first back surgery (Ex. 13F at 8; 14F at 22, 28, 33, 39, 46, and 55). On one examination with David McCord, M.D. in December 2017, she exhibited an antalgic gait (Ex. l7F at 7). However, there is no evidence she has been prescribed or uses an assistive device (Ex. 6E at 7). After her second surgery in March 2018, she reported "staying active and walking two miles a day" (Ex. 22F at 4). She did not report such significant side effects to treating providers as reported in her Function Report (Ex. 6E at 8; 23F at 4, 7). The treatment record also does not show the degree of sensory loss/neuropathy that she described at the hearing (Ex. 23F at 7). The record indicates that she lives alone and is able to perform most activities of daily living without assistance, contrary to her

allegations as to the severity of her limitations (Ex. 11F).

(R. 105-06.) The ALJ stated that these findings supported his RFC determination of light duty work with the additional postural and overhead reaching limitations he described. (R. 106.)

Before moving on to the medical opinion evidence, the ALJ also acknowledged Strawn's complaints of shortness of breath, noting that a "pulmonary function test in June 2017 showed moderate obstruction with mild diffusion impairment, consistent with moderate COPD." (R. 105, 659). The ALJ further commented that "[a] November 2017 spirometry report indicates improvement, showing only mild obstruction and with lung volumes consistent with mild restrictive lung disease." (R. 105, 699.) Lastly, the ALJ noted that Strawn's asthma was described as "stable" in January 2018, and Strawn was cleared for surgery from a pulmonary standpoint at that time. (R. 105, 844.)

The ALJ then proceeded to address the medical opinion evidence in the record. (R. 106.) The ALJ began first with the assessment of psychological consultative examiner, Dennis W. Wilson, Ph.D., completed on October 17, 2017. (R. 106, 685-92.) The ALJ acknowledged Dr. Wilson's status as a licensed psychologist and found his opinion to be "persuasive" and "consistent with the treatment findings." (R. 106.) The ALJ emphasized that "the

-8-

examiner found that [Strawn's] communication skills and social skills were good, consistent with her being not significantly to mildly limited in her ability to interact with others." (R. 106, 690.) The ALJ also deemed Dr. Wilson's assessment to be "consistent with the record as a whole, which shows minimal treatment for psychological symptoms." (R. 106.)

The ALJ then discussed the opinions rendered by the state agency psychological consultants, C. Warren Thompson, Ph.D., completed on October 25, 2017, and David Strand, Ph.D., completed on May 21, 2018. (R. 106, 144-57, 160-79.) The ALJ again acknowledged the expertise of the consultants and found their opinions to be "persuasive." (R. 106.) Dr. Thompson and Dr. Strand both opined that Strawn had only mild overall mental limitations and that her symptoms and impairments would cause no more than mild limitations in basic work duties. (R. 149-50, 170-72.) The ALJ additionally determined that both opinions were "consistent with the consultative examiner's mental status examination findings largely within normal limits and opinions as to no more than mild limitations, as well as [Strawn's] minimal and conservative mental treatment history." (R. 106, 149-50, 170-72.)

The ALJ then discussed the opinions rendered by the state agency medical consultants, Peter A. Bernardo, M.D., completed on

October 11, 2017, and Martin Rubinowitz, M.D., completed on May 21, 2018. (R. 106, 144-57, 160-79.) The ALJ deemed these opinions to be "persuasive" and "generally consistent with the record as a whole," emphasizing that the opinions were "well supported with references to the treatment notes." (R. 106.) The ALJ stated that "[Strawn's] history of back surgeries supports the postural limitations and limitation to light work, and her cervical degenerative disc disease supports the limitation as to occasional overhead reaching, as noted in the assessment." (R. 106.) The ALJ also found the "stand and walking limitation" opined by Dr. Bernardo to be "less persuasive" than the limitation opined by Dr. Rubinowitz. (R. 106.) Dr. Bernardo opined that Strawn could stand and/or walk for four hours while Dr. Rubinowitz opined that she could stand and/or walk for six hours. (R. 152, 174.) In finding Dr. Rubinowitz's assessment more persuasive, the ALJ stated that "[t]he evidence of normal gait on examination following her first surgery and [Strawn's] report as to staying active and walking two miles following her second surgery supports that she is capable of standing and/or walking for six hours in an eight-hour workday." (R. 106 (citing R. 724, 779, 785, 790, 796, 803, 812, 947).)

The ALJ then addressed the medical opinion rendered by Strawn's treating physician, David McCord, M.D., on June 19, 2018.

(R. 106, 962.) The ALJ stated as follows:

> Dr. McCord opined that [Strawn] was not able to return
> to the workforce and gave limitations of lifting,
> bending, twisting, and working at heights and overhead
> (Ex. 23F at 7). He did not opine with any specificity as
> to what degree she would be limited in these functions.
> He also did not provide adequate support for this opinion
> considering that in the same treatment note he indicated
> that she was "doing relatively well from her recent
> surgery" and that her "x-rays look quite good" (Ex. 23F
> at 7). He also noted that she had no motor weakness or
> sensory loss on examination (Ex. 23F at 7).

(R. 106.) The ALJ also discussed another medical opinion
purportedly rendered by Dr. McCord.[2] (R. 106-07, 975-78.) The ALJ
found this medical opinion "unpersuasive," stating as follows:

> The record does not support the opinion that [Strawn]
> would be limited to standing and/or walking for less
> than two hours in an eight-hour workday. For example,
> [Dr. McCord's opinion is] inconsistent with the June
> 2018 treatment notes that [Strawn] had a normal heel-
> to-toe walk, no sensory loss, no motor weakness, and
> that she was "walking and staying active" (Ex. 23F at
> 7). This is also inconsistent with treatment notes in
> May 2018 noting that she was "walking two miles a day"
> (Ex. 22F at 4).

(R. 106-07.)

Lastly, the ALJ discussed the opinion of a licensed clinical
worker, Marvyn Hegmon, LCSW, completed on January 11, 2019. (R.
107, 1184-86.) The ALJ found the opinion "unpersuasive," stating

---

[2]The ALJ noted that the signature on the opinion was illegible but
that Strawn's attorney had indicated the form was completed by Dr.
McCord. (R. 106, 975-78.)

as follows:

> This [opinion] is not well supported, as [Hegmon's] explanation refers to [Strawn's] reported symptoms but not any objective medical findings. It is also inconsistent with [Dr. Wilson's] findings and opinions and [Hegmon's] own treatment notes, neither of which support the severity of limitations opined. For example, [Hegmon] opined that [Strawn] had marked limitation in understanding, remembering, and carrying out simple instructions, yet the consultative examiner [Dr. Wilson] found that [Strawn] seemed to be functioning in the average to 'perhaps above average' range of intelligence and exhibited intact memory (Ex. 11F at 6). Moreover, [Hegmon] opined as to moderate limitations interacting appropriately with the public and marked limitations interacting with supervisors and co-workers, yet [Hegmon's] treatment notes as recently as November 2018 indicate [Strawn] had appropriate thought content and behavior, euthymic mood, and appropriate affect (Ex. 32F at 4). They further note [Strawn] was actively engaged and stable (Ex. 32F at 4). This is also inconsistent with [Dr. Wilson's] findings that [Strawn's] communication skills and social skills were good (Ex. 11F at 7).

(R. 107.) After considering the evidence in the record, the ALJ concluded that Strawn's RFC included light work with the additional postural and reaching limitations described above. (R. 107.)

At step four, the ALJ found that "[Strawn] is unable to perform any past relevant work." (R. 107.) Based on the testimony of a vocational expert, the ALJ concluded that the demands of Strawn's past work as a firefighter, fire captain, and fire chief exceed her RFC. (R. 107, 139.) The ALJ then discussed Strawn's age, education, and work experience. (R. 108.) The ALJ stated that

"[Strawn] was born on July 3, 1964 and was 52 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date." (R. 108.) The ALJ acknowledged the "borderline age situation" because Strawn was months away from turning fifty-five at the time of the ALJ's opinion. (R. 108.) The ALJ stated that although "use of the higher age category would result in a finding of 'disabled' instead of 'not disabled', use of this age category is not supported by the limited adverse impact of all factors on [Strawn's] ability to adjust to other work." (R. 108.) The ALJ explained that in addition to being "several months away from turning age 55," Strawn "has a high school education and a significantly long and continuous work history." (R. 108.) Additionally, the ALJ noted that "the lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping." (R. 108.) Accordingly, the ALJ concluded that "use of the next higher age category is not supported." (R. 108.)

The ALJ again relied on the vocational expert's testimony in finding at step five that "considering [Strawn's] age, education, work experience, and residual functional capacity, [Strawn] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 109.) The

vocational expert testified that given the factors listed above, Strawn could perform the requirements of "light, unskilled representative occupations" including "Weight Recorder (DOT 222.387-074), with 17,630 jobs nationally; Furniture Rental Consultant (DOT 295.357-018), with 83,200 jobs nationally; and Investigator, Dealer Accounts (DOT 241.367-038), with 183,540 jobs[3] nationally." (R. 109, 140-41.) Accordingly, the ALJ determined that Strawn had not been under a disability, as defined by the Act, from February 5, 2017, through the date of the ALJ's decision. (R. 109.)

On March 20, 2019, the ALJ issued a decision detailing the findings summarized above. (R. at 99-109.) On January 22, 2020, the SSA Appeals Council denied Strawn's request for review of the hearing decision. (R. at 1-7.) Strawn now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner under § 1631(c)(3) of the Act. On appeal, Strawn raises three arguments: (1) that additional evidence she submitted to the Appeals Council justifies remand; (2) that the ALJ erred in his consideration of the medical opinion evidence in the record;

---

[3]The undersigned notes that the vocational expert testified to an estimated 183,504 of these jobs being performed in the national economy, rather than 183,540 as indicated in the ALJ's opinion. (R. 141.)

-14-

and (3) that the ALJ erred by placing her in the wrong age category.[4]

## II.  ANALYSIS

### A.  Standard of Review

Under 42 U.S.C. § 405(g), a claimant may obtain judicial review of any final decision made by the Commissioner after a hearing to which he or she was a party. "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Judicial review of the Commissioner's decision is limited to whether there is substantial evidence to support the decision and whether the Commissioner used the proper legal criteria in making the decision. Id.; Cardew v. Comm'r of Soc. Sec., 896 F.3d 742, 745 (6th Cir. 2018); Cole v.

---

[4]The undersigned notes that Strawn lists five issues in her brief, but upon closer examination, the legal arguments contained under headings one, three, and five pertain only to the ALJ's consideration of the medical opinion evidence. To the extent that Strawn seeks to assert a standalone argument under heading five, such as challenging the ALJ's decision generally as being unsupported by substantial evidence, the argument is not sufficiently developed and is therefore waived. See Leary v. Livingston Cty., 528 F.3d 438, 449 (6th Cir. 2008) ("It is a settled appellate rule that issues averred to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotation marks omitted).

Astrue, 661 F.3d 931, 937 (6th Cir. 2011); Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is more than a scintilla of evidence but less than a preponderance, and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

In determining whether substantial evidence exists, the reviewing court must examine the evidence in the record as a whole and "must 'take into account whatever in the record fairly detracts from its weight.'" Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). If substantial evidence is found to support the Commissioner's decision, however, the court must affirm that decision and "may not even inquire whether the record could support a decision the other way." Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994) (quoting Smith v. Sec'y of Health & Human Servs., 893 F.2d 106, 108 (6th Cir. 1989)). Similarly, the court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (citing Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Rather, the Commissioner, not the court, is

charged with the duty to weigh the evidence, to make credibility determinations, and to resolve material conflicts in the testimony. Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 528 (6th Cir. 1997); Crum v. Sullivan, 921 F.2d 642, 644 (6th Cir. 1990).

## B.   The Five-Step Analysis

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1). Additionally, section 423(d)(2) of the Act states that:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

Under the Act, the claimant bears the ultimate burden of establishing an entitlement to benefits. Oliver v. Comm'r of Soc. Sec., 415 F. App'x 681, 682 (6th Cir. 2011). The initial burden is

on the claimant to prove she has a disability as defined by the Act. Siebert v. Comm'r of Soc. Sec., 105 F. App'x 744, 746 (6th Cir. 2004) (citing Walters, 127 F.3d at 529); see also Born v. Sec'y of Health & Human Servs., 923 F.2d 1168, 1173 (6th Cir. 1990). If the claimant is able to do so, the burden then shifts to the Commissioner to demonstrate the existence of available employment compatible with the claimant's disability and background. Born, 923 F.2d at 1173; see also Griffith v. Comm'r of Soc. Sec., 582 F. App'x 555, 559 (6th Cir. 2014).

Entitlement to social security benefits is determined by a five-step sequential analysis set forth in the Social Security Regulations. See 20 C.F.R. §§ 404.1520 & 416.920. First, the claimant must not be engaged in substantial gainful activity. See 20 C.F.R. §§ 404.1520(b) & 416.920(b). Second, a finding must be made that the claimant suffers from a severe impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii) & 416.920(a)(5)(ii). In the third step, the ALJ determines whether the impairment meets or equals the severity criteria set forth in the Listing of Impairments contained in the Social Security Regulations. See 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. If the impairment satisfies the criteria for a listed impairment, the claimant is considered to be disabled. On the other hand, if the claimant's impairment does not meet or equal

-18-

a listed impairment, the ALJ must undertake the fourth step in the analysis and determine whether the claimant has the RFC to return to any past relevant work. See 20 C.F.R. §§ 404.1520(a)(4)(iv) & 404.1520(e). If the ALJ determines that the claimant can return to past relevant work, then a finding of not disabled must be entered. Id. But if the ALJ finds the claimant unable to perform past relevant work, then at the fifth step the ALJ must determine whether the claimant can perform other work existing in significant numbers in the national economy. See 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g)(1), 416.960(c)(1)-(2). Further review is not necessary if it is determined that an individual is not disabled at any point in this sequential analysis. 20 C.F.R. § 404.1520(a)(4).

## C.  Additional Evidence

Strawn argues that the additional evidence she submitted to the Appeals Council when seeking review of the ALJ's decision justifies remand under sentence six of 42 U.S.C. § 405(g). The additional evidence Strawn submitted included treatment records from Saint Thomas Midtown Hospital from April and May of 2019 (R. 14, 19-47, 52-82, 85-88) and treatment records from Dr. McCord from January, March, April, and May of 2019 (R. 16-18, 49-51, 89-95). As an initial matter, "evidence submitted to the Appeals

Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." Foster v. Halter, 279 F.3d 348, 357 (6th Cir. 2001). The court "simply [i]s not in the position to consider new evidence in 'deciding whether to uphold, modify, or reverse the ALJ's decision.'" Miller v. Comm'r of Soc. Sec., 811 F.3d 825, 839 (6th Cir. 2016) (quoting Cline v. Comm'r of Soc. Sec., 96 F.3d 146, 148 (6th Cir. 1996)). Yet, in limited circumstances, new evidence may justify remand under 42 U.S.C. § 405(g).

Courts may remand a case to an ALJ for review of additional evidence "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . ." 42 U.S.C. § 405(g). As the language of the statute indicates, this places the burden of production upon the claimant. See Miller, 811 F.3d at 839; see also Hollon v. Comm'r of Soc. Sec., 447 F.3d 477, 483 (6th Cir. 2006) ("The party seeking a remand bears the burden of showing that these . . . requirements are met.") (citing Foster, 279 F.3d at 357). "For the purposes of a 42 U.S.C. § 405(g) remand, evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" Foster, 279 F.3d at 357 (quoting Sullivan v.

<u>Finkelstein</u>, 496 U.S. 617, 626 (1990)). "Such evidence is 'material' only if there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'" <u>Id.</u> (quoting <u>Sizemore v. Sec'y of Health & Human Servs.</u>, 865 F.2d 709, 711 (6th Cir. 1988)). Lastly, "[a] claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." <u>Id.</u> (citing <u>Willis v. Sec'y of Health & Human Servs.</u>, 727 F.2d 551, 554 (1984)).

All except one of the medical records submitted by Strawn correspond to treatment dates after the administrative hearing conducted by the ALJ on February 1, 2019. Strawn's materiality argument stems from the fact that she underwent "continuing treatment including further surgery" after the administrative hearing. (ECF No. 14, at 15.) "But '[e]vidence of a subsequent deterioration or change in condition after the administrative hearing is . . . immaterial' and does not warrant a remand." <u>Lee v. Comm'r of Soc. Sec.</u>, No. 18-4024, 2019 U.S. App. LEXIS 17422, 2019 WL 5435853, at *3 (6th Cir. June 10, 2019) (quoting <u>Wyatt v. Sec'y of Health & Human Servs.</u>, 974 F.2d 680, 685 (6th Cir. 1992)); <u>see also Deloge v. Comm'r of Soc. Sec.</u>, 540 F. App'x 517, 519 (6th

Cir. 2013) ("Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition.") (quoting Sizemore, 865 F.2d at 712). Strawn asserts that "[t]he new evidence . . . undermines the ALJ's dismissal of the treating physician's opinion" and "goes to the heart of the ALJ's determination of credibility and disability." (Id.) However, other than referencing her additional surgery, which occurred in April 2019, Strawn does not cite to or discuss any specific findings from the additional treatment records she submitted. See Deloge, 540 F. App'x at 519. Accordingly, the undersigned finds that Strawn has not met her burden of establishing the materiality of these records, as she has not demonstrated a reasonable probability that they would likely change the ALJ's decision. See Bass v. McMahon, 499 F.3d 506, 513 (6th Cir. 2007).

In addition, it is unclear whether the treatment record from January 2019 qualifies as new, which would require that it either did not exist or was unavailable to Strawn at the time of her hearing before the ALJ. See Foster, 279 F.3d at 357. Referring to all of the additional evidence collectively, Strawn states that "[t]he evidence is new and was timely submitted because it literally did not exist before." (ECF No. 14, at 15.) However, the

record from January 2019 predates the hearing on February 1, 2019.
While this treatment record may have been unavailable to Strawn
prior to the hearing, she does not allege when it became available
or when it was obtained. Moreover, Strawn does not allege any
efforts to procure the document or any obstacles in doing so. See
Hollon, 447 F.3d at 485 ("[T]here is no indication that any of the
evidence cited by Hollon as grounds for a remand was unavailable
to her during the course of the administrative proceedings. Nor
has she identified any obstacles to her submission of this evidence
during those proceedings."); see also Bass, 499 F.3d at 513
("Plaintiff has not detailed any obstacles that prevented him from
entering this evidence, all of which predates the hearing before
the ALJ[.]") (citing Willis, 727 F.2d at 554). Accordingly, the
undersigned finds that Strawn has not met her burden of
establishing that the January 2019 record qualifies as new or that
she had good cause for not acquiring and presenting it to the ALJ
prior to the hearing. Based on the above, remand is not proper
under 42 U.S.C. § 405(g).

## D.  Medical Opinion Evidence

Strawn argues that the ALJ did not follow applicable
regulations when determining her RFC and that the ALJ's RFC
determination was not supported by substantial evidence. Because

both arguments involve the ALJ's consideration of medical opinion evidence, the undersigned addresses them together under the same heading.

As a preliminary matter, because Strawn filed her application for benefits after March 27, 2017, the ALJ was required to adhere to 20 C.F.R. § 404.1520c in considering medical opinions and prior administrative medical findings in the record.[5] See Jones v. Berryhill, 392 F. Supp. 3d 831, 839 (E.D. Tenn. 2019). For claims filed before March 27, 2017, 20 C.F.R. § 404.1527 governs the evaluation of medical opinion evidence. The distinction is meaningful because the revisions to the regulatory language "eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion." Lester v. Saul, No. 5:20CV1364, 2020 WL 8093313, at *10 (N.D. Ohio, Dec. 11, 2020), report and recommendation adopted by, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021) (quoting Ryan L.F. v. Comm'r of Soc. Sec., No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019)). In other words, claims filed on or after March 27,

---

[5]While Strawn acknowledges in her statement of facts that she applied for benefits on May 14, 2017, she mistakenly lists a filing date of March 14, 2017 in her legal argument section. (ECF No. 14, at 1, 12.) The record demonstrates that her application was filed in May 2017. (R. 99, 158, 180, 259-60.)

2017, which fall under 20 C.F.R. § 404.1520c, are not subject to the "treating physician rule." <u>Jones</u>, 392 F. Supp. 3d at 839.

Many of Strawn's arguments lack merit because although she references § 404.1520c, she bases her arguments on standards set forth in § 404.1527 and cites exclusively to cases dealing with the evaluation of medical opinion evidence under the prior regulatory language. For example, Strawn repeatedly asserts that the ALJ erroneously determined that her treating source opinions "were not entitled to weight" when really "[t]hey are entitled to great weight." (ECF No. 14, at 2, 4.) Elsewhere, Strawn asserts that findings from a treating source "are entitled to most weight under the regulations" and that "[t]here was no reason to afford less than great weight to Dr. McCord's or Therapist Hegmon's findings and opinions." (<u>Id.</u> at 6, 13-14.) Similarly, Strawn asserts that the non-examining consultants' opinions were "entitled to no weight." (<u>Id.</u> at 4, 5.) In addition, Strawn includes the treating physician rule in her standard of review. (<u>Id.</u> at 11.) Strawn later states that an ALJ "must assign and explain the weight afforded medical opinions in the record," additionally asserting that an ALJ's failure to weigh all medical opinions is error requiring reversal. (<u>Id.</u> at 17-18.) Strawn also states that ALJs must provide "good reasons" for their evaluations

of medical opinions, a standard set forth in § 404.1527(c)(2). (Id. at 17.)

All of these arguments lack merit in a case such as this where 20 C.F.R. § 404.1520c applies. As stated above, the treating physician rule does not apply here, see Jones, 392 F. Supp. 3d at 839, and the language of 20 C.F.R. § 404.1520c "eliminate[s] . . . assigning 'weight' to a medical opinion." Lester, 2020 WL 8093313, at *10. Under 20 C.F.R. § 404.1520c(a), an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." Accordingly, the ALJ was not obligated to show greater deference to the opinions of the treating sources than those of the consultative and non-examining sources. See 20 C.F.R. § 404.1520c(a). Rather, the ALJ needed only consider the persuasiveness of each opinion. See 20 C.F.R. § 404.1520c(b).

Because Strawn relies on the incorrect regulatory standard in challenging the ALJ's consideration of the medical opinion evidence, her arguments do not provide a basis for reversal. However, for Strawn's benefit, the undersigned will also address the ALJ's consideration of the medical opinion evidence under the standard set forth in 20 C.F.R. § 404.1520c. As explained below,

-26-

even if Strawn had relied on the correct standard, the court would nevertheless find that the ALJ properly considered the medical opinions in the record. Pursuant to 20 C.F.R. § 404.1520c, ALJs are directed to analyze the persuasiveness of medical opinions and prior administrative medical findings by considering five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) any other factor "that tend[s] to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§ 404.1520c(c)(1)-(5). The regulations provide that supportability and consistency are the most important factors to consider. 20 C.F.R. § 404.1520c(a). In articulating the persuasiveness of each medical source opinion, an ALJ must explain how he or she considered these two factors. 20 C.F.R. § 404.1520c(b)(2). As for the other listed factors, the regulations state that an ALJ may, but is not required to, articulate how he or she considered them in evaluating a medical opinion. 20 C.F.R. § 404.1520c(b)(2). While these new standards are more relaxed than their predecessors, an ALJ must still "provide a coherent explanation of his [or her] reasoning" in analyzing each medical opinion. Lester, 2020 WL 8093313, at *14.

In assessing the medical opinion evidence in the record, the ALJ first addressed the opinion of the consultative examiner, Dr.

Wilson, completed in October 2017. The ALJ deemed Dr. Wilson's opinion to be persuasive, finding it supported by the treatment findings and consistent with the record as a whole. The ALJ emphasized that Dr. Wilson found that Strawn had good communication and social skills, findings "consistent with her being not significantly to mildly limited in her ability to interact with others." (R. 106, 690.) The ALJ also acknowledged Dr. Wilson's specialization as a licensed psychologist.

The ALJ then addressed the opinions rendered by the state agency psychological consultants, Dr. Thompson and Dr. Strand, in October 2017 and May 2018, respectively. The ALJ acknowledged the expertise of the consultants and found their opinions to be persuasive, finding that their opinions were consistent with Dr. Wilson's examination findings and opinions, as well as Strawn's minimal and conservative mental treatment history. The ALJ then moved to the opinions rendered by the state agency medical consultants, Dr. Bernardo and Dr. Rubinowitz, from October 2017 and May 2018. The ALJ also found these opinions persuasive, finding that they were consistent with the record as a whole and well supported with discussions of Strawn's treatment records. The ALJ concurred with the assessments that Strawn's history of back surgeries and cervical degenerative disc disease supported

limiting her to light work with postural and overhead reaching limitations. The ALJ also stated that he found Dr. Rubinowitz's opinion as to Strawn's standing and walking limitation more persuasive than that of Dr. Bernardo, stating that "[t]he evidence of normal gait on examination following her first surgery and [Strawn's] report as to staying active and walking two miles following her second surgery supports that she is capable of standing and/or walking for six hours in an eight-hour workday." (R. 106.)

The ALJ then addressed the reports from Strawn's treating physician, Dr. McCord, which the ALJ found unpersuasive. In a treatment record dated June 19, 2018, Dr. McCord opined that Strawn was not able to return to the work force and stated that she had limitations in lifting, bending, twisting, and working at heights and overhead. (R. 106, 962.) The ALJ stated that Dr. McCord did not provide adequate support for this opinion because the same treatment record stated that Strawn was "doing relatively well from her recent surgery" and her "x-rays look quite good." (R. 106, 962.) The ALJ also noted that the treatment record additionally indicated no motor weakness or sensory loss on examination. (R. 106, 962.) Regarding the other medical opinion rendered by Dr. McCord, the ALJ stated that the recommended

limitation of standing and/or walking for less than two hours in an eight-hour workday was not supported by the record. (R. 106-07, 975.) The ALJ stated that the opinion was inconsistent with Dr. McCord's own treatment notes from May 2018, indicating that Strawn was "walking two miles a day," and his treatment notes from June 2018, which indicated that Strawn had a normal heel-to-toe walk, no sensory loss, no motor weakness, and that she was "walking and staying active." (R. 107, 947, 962.)

Lastly, the ALJ addressed the opinion of Strawn's treating therapist, Ms. Hegmon, rendered in January 2019. The ALJ found the opinion unpersuasive, stating that it was not well supported because Hegmon's explanations did not refer to any objective medical findings. (R. 107, 1184-86.) The ALJ also noted that Hegmon's opinion was "inconsistent with [Dr. Wilson's] findings and opinions and [Hegmen's] own treatment notes, neither of which support the severity of limitations opined." (R. 107.) The ALJ then detailed the various inconsistencies.

As stated above, Strawn did not properly challenge the ALJ's consideration of medical opinion evidence under the updated regulatory language applicable to claims filed on or after March 27, 2017. Nevertheless, the undersigned finds that the ALJ adhered

to the requirements of 20 C.F.R. § 404.1520c when assessing each of the medical opinions in the record.

The remainder of Strawn's challenges to the ALJ's treatment of the medical opinions also fail. For example, Strawn argues that the ALJ improperly dismissed one of Dr. McCord's reports based on "his feeling that it needed further explanation, although he made no effort to contact the examiner to resolve it." (ECF No. 14, at 18.) Strawn offers no factual support for this argument, as she does not point to any language from the ALJ's decision or cite to any portion of the record. From Strawn's briefing it is not entirely clear to which of Dr. McCord's opinions this argument applies. Moreover, Strawn provides no relevant legal basis for this argument, citing only to an inapplicable provision of 20 C.F.R. Part 416. As an initial matter, the undersigned notes that 20 C.F.R. Part 416 pertains to claims for Supplemental Security Income ("SSI"), and Strawn has not filed for SSI in this case. (R. 99, 259.) In addition, the specific provision she cites, 20 C.F.R. § 416.919p, applies only to reports by consultative examiners, not treating physicians. Thus, even if Strawn had sufficiently established that the ALJ deemed Dr. McCord's opinion to be "inadequate or incomplete," she has not provided any basis for

concluding that the ALJ had an obligation to contact him for further explanation.

Similarly, Strawn argues that the ALJ improperly submitted his own opinions for those of the treating physicians, noting in her brief that an ALJ cannot cherry-pick among evidence to reach a preferred conclusion. (ECF No. 14, at 4, 17.) Strawn also emphasizes that "[t]here is no treating or examining source opinion that is consistent with the ALJ's RFC finding." (Id. at 7.) However, as stated above, the ALJ was not obligated to show greater deference to the treating source opinions than those of the non-examining doctors. See Lester, 2020 WL 8093313, at *10; see also 20 C.F.R. § 404.1520c(a). In addition, the Sixth Circuit Court of Appeals has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." Mokbel-Aljahmi v. Comm'r of Soc. Sec., 732 F. App'x 395, 401 (6th Cir. 2018) (citing Shepard v. Comm'r of Soc. Sec., 705 F. App'x 435, 442-43 (6th Cir. 2017) (rejecting the argument that "the ALJ's RFC lacks substantial evidence because no physician opined that [the claimant] was capable of light work"); Rudd v. Comm'r of Soc. Sec., 531 F. App'x 719, 728 (6th Cir. 2013) (rejecting the same argument because "the ALJ is charged with the

responsibility of determining the RFC based on her evaluation of
the medical and non-medical evidence")). The record reflects that
the ALJ considered each medical opinion in accordance with the 20
C.F.R. § 404.1520c and determined the persuasiveness of each
opinion based on the evidence in the record. While Strawn implies
that the ALJ "cherry-picked" evidence, "the same process can be
described more neutrally as weighing the evidence." White v. Comm'r
of Soc. Sec., 572 F.3d 272, 284 (6th Cir. 2009); see also DeLong
v. Comm'r of Soc. Sec., 748 F.3d 723, 726 (6th Cir. 2014) (finding
that an allegation of "cherry picking" the record "is seldom
successful because crediting it would require a court to re-weigh
record evidence.").

Strawn also broadly asserts that the treating source
opinions, treatment records, and her hearing testimony[6] demonstrate

---

[6]While Strawn spends several pages in her statement of facts
detailing her testimony before the ALJ, she does not challenge the
ALJ's determination of her credibility except to assert that the
additional evidence submitted to the Appeals Council justifies
remand. In the first heading of her legal argument section, Strawn
asserts that the treating source opinions, treatment records, and
her "honest and consistent testimony" show her to be disabled.
(ECF No. 14, at 12.) However, none of the arguments in that section
address the ALJ's credibility determination. See Jones, 392 F.
Supp. 3d at 841. Similarly, Strawn does not provide the applicable
standard for review. See id. at 840-41. Accordingly, this argument
is not sufficiently developed and is therefore waived. See Leary,
528 F.3d at 449; see also Rogers v. Comm'r of Soc. Sec., 486 F.3d
234, 247 (6th Cir. 2007) ("It is not sufficient for a party to
mention a possible argument in the most skeletal way, leaving the

-33-

that she is disabled from the alleged onset date. (ECF No. 14, at 12.) However, if substantial evidence supports the ALJ's determination, the court "may not even inquire whether the record could support a decision the other way." Barker, 40 F.3d at 794. Rather, the court "defer[s] to that decision even in the face of substantial evidence supporting the opposite conclusion." Moruzzi v. Comm'r of Soc. Sec., 759 F. App'x 396, 406 (6th Cir. 2018) (citing Blakley v. Comm'r of Soc. Sec., 581 F.3d 399, 406 (6th Cir. 2009)). The undersigned finds that the ALJ adhered to requirements of 20 C.F.R. § 404.1520c in considering the medical opinion evidence and that based on the record, the ALJ's RFC determination is supported by substantial evidence.

**E.   Age Category**

Lastly, Strawn argues that the ALJ improperly placed her in the wrong age category. (ECF No. 14, at 19.) The ALJ acknowledged that Strawn was fifty-two years old at the alleged disability onset date but stated that she qualified as "a younger individual age 18-49." (R. 108.) Pursuant to 20 C.F.R. § 404.1563(c), a "younger person" is someone under the age of fifty, while § 404.1563(e)

---

court to . . . put flesh on its bones."). Nevertheless, the undersigned finds that upon review of the ALJ's decision, it is clear that the ALJ considered the entire record when determining Strawn's credibility.

dictates that an individual over the age of fifty-five qualifies as a "person of advanced age." An individual between the ages of fifty and fifty-four qualifies as a "person closely approaching advanced age." 20 C.F.R. § 404.1563(d). Pursuant to these regulations, the ALJ should have deemed Strawn a "person closely approaching advanced age" under § 404.1563(d). Of course, the ALJ in this instance stated that "a borderline age situation exists because [Strawn] is within a few days to a few months of attaining the next higher category" and then acknowledged that Strawn was "months away from turning age 55." (R. 108.) Nevertheless, Strawn argues that "[w]e really can't tell what age category the ALJ meant, so remand is clearly required." (ECF No. 14, at 19.) The undersigned disagrees.

The ALJ characterized Strawn as an individual "age 18-49" in the same sentence that he acknowledged her age as being "52 years old" at the alleged disability onset date. (R. 108.)   The government concedes that the ALJ made an error and cited to the wrong grid rule as a result, but maintains that the error is harmless. (ECF No. 17, at 16.) The ALJ cited grid rule 202.21, which is under the table for a light residual functional capacity, younger individual 18 to 49, with a high school education or more, and no transferable skills. (R. 108.) This grid rule directs a

-35-

finding of "not disabled." 20 C.F.R. Part 404, Subpart P, Appendix 2, Table 2, Rule 202.21. However, because Strawn qualifies as "closely approaching advanced age," the ALJ should have cited to grid rule 202.14, which similarly directs a finding of "not disabled." 20 C.F.R. Part 404, Subpart P, Appendix 2, Table 2, Rule 202.14. Clearly, when stating that "use of the higher age category would result in a finding of 'disabled' instead of 'not disabled'," the ALJ was not referring to "approaching advanced age" as the next higher category. (R. 108.) Rather, the ALJ was acknowledging that Strawn was on the border of "advanced age" as defined by § 404.1563(e). The ALJ considered Strawn's age, education, work history, and RFC in determining that "use of the next higher age category is not supported."[7] (R. 108.) The ALJ also correctly recalled Strawn's age and other relevant details when proposing hypotheticals to the vocational expert at the administrative hearing. (R. 140.) Based on the above, the

---

[7]Strawn additionally asserts that "[t]he ALJ erred by failing to heed the agency guidance found in POMS DI 25015.006 Borderline Age, which would have directed treating claimant as a person of advanced age, and therefore a finding of disabled." (ECF No. 14, at 19.) However, Strawn does not point to any specific language from the Program Operations Manual System ("POMS") or articulate why its guidance would require treating Strawn as a person of advanced age. The agency guidance makes clear that claimants are not automatically placed in the higher age category in borderline age situations. At any rate, this argument is waived because it is not sufficiently developed. See Rogers, 486 F.3d at 247.

undersigned finds that the error was harmless and is not a basis for reversal.

### III.  CONCLUSION

For the reasons above, the decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

August 9, 2021
Date

-37-